IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA BARBER,<br>    1212 Punahou, St. #3101<br>    Honolulu, HI 96826<br><br>    *Plaintiff*,<br><br>    v.<br><br>THE HONORABLE<br>CARLOS DEL TORO<br>    Secretary of the Navy<br>    Department of the Navy<br>    1000 Navy Pentagon<br>    Washington, DC 20350<br><br>    *Defendant*. | No._____ |

## COMPLAINT

Plaintiff, Joshua Barber ("Plaintiff"), by and through undersigned counsel, respectfully brings this civil action against Defendant Carlos Del Toro ("Defendant"), in his official capacity as U.S. Secretary of the Navy. Plaintiff asks the Court to hold that Defendant, acting through the U.S. Navy's Board for Correction of Naval Records (BCNR), has arbitrarily and capriciously denied Plaintiff's petition to correct his military record. As grounds therefore, Plaintiff alleges:

## PARTIES

1. Plaintiff Joshua Barber served on active duty in the United States Marine Corps until his discharge in February 2020.

2. Defendant Carlos Del Toro is the Secretary of the Navy and is named in his official capacity as the head of the BCNR.

## JURISDICTION AND VENUE

3. This claim is brought forth under the Administrative Procedure Act (APA). This Court therefore has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 704.

4. Venue in this District is proper pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703.

## STATEMENT OF FACTS

5. Mr. Barber served on active duty in the Marine Corps from 2002 to 2020, attaining the rank of Gunnery Sergeant (and selected for promotion to First Sergeant) in his nearly 18 years of service.

6. In 2018, while stationed at Marine Corps Base Kaneohe Bay, Hawaii, Mr. Barber and a female Marine junior officer formed a romantic relationship that led to marriage. Although nominally assigned to the same large unit, Mr. Barber and his wife[1] were not in the same direct chain of command, nor did she have any influence over his career. Their respective jobs did not require them to engage professionally on a daily basis. Furthermore, during the entirety of their relationship, they maintained a strict separation between their personal and professional lives, such that no one in the command was aware of the relationship.

7. That is, until his wife was set to undergo a periodic move to another duty station back in the Continental United States. To ensure follow on orders for Mr. Barber to the same duty station, the two had to record the marriage with the respective administrative personnel at the base's Installation Personnel Administration Center (IPAC).

---

[1] Mr. Barber and his wife have since divorced, caused in no small part due to the interference and objection of the Marine Corps; however, she will be referred to as his wife for the purposes of continuity.

8.  Mr. Barber filed his paperwork shortly after the couple's wedding in June 2018. Knowing that at least one of them had documented the marriage, Mr. Barber's wife elected to wait until she arrived at her new unit. Doing so would undoubtedly cause the least amount of disruption, as a relationship of this nature between an officer and an enlisted is considered per-se fraternization.

9.  However, as his wife attempted to conduct her out processing from the base through IPAC, one of the administrative personnel flagged her record for being inconsistent with Mr. Barber's marriage form. This in turn set off a most unfortunate sequence of events, in which the entire command, all the way to the Battalion Commander, became involved. Mr. Barber and his wife were soon faced with an inordinate amount of interference instigated by the Marine Corps.

10. Almost instantly, an investigation was initiated and both Mr. Barber and his wife faced criminal charges for fraternization—or in other words, they faced criminal charges for having made the most sacred of commitments: marriage. Although the two were legally married, the command initiated a military protective order, precluding the two from having any further contact or communication. This, of course, had a drastic effect on their relationship and created waves of rumors that permeated the command, which in turn caused the command to increase the intensity of its punishments on Mr. Barber and his wife.

11. In lieu of court-martial, Mr. Barber's wife readily accepted non-judicial punishment (NJP) with a promise to resign her commission. After all, she was just a First Lieutenant, having served only a handful of years in the Marine Corps.

12. Mr. Barber, on the other hand, had a significantly longer period of service—and was nearly retirement eligible. His primary concern was preserving his retirement, which meant being allowed to reenlist for two more years following the end of his enlistment in December 2019.

For this reason, Mr. Barber initially elected to challenge his charges at a court-martial, which would allow him to move to dismiss the charges on the basis that the absolute prohibition on marriages between officers and enlisted, and the non-rebuttable presumption of prejudice to good order and discipline, was unconstitutional. But his command again interfered in his relationship, threatening to cause further harm to his wife if she did not testify against him at trial. Faced with the prospect of coerced and almost certainly adverse testimony against him from his own wife, Mr. Barber elected to accept NJP. In doing so, the *only* outcome that Mr. Barber made sure to secure was the ability to safeguard his retirement through reenlistment.

13.     Procedurally, going from the court-martial to NJP meant that Mr. Barber and the court-martial Convening Authority, the Commanding General (CG) of 3d Marine Division, Major General (MajGen) William Jurney, entered into a pre-trial agreement (PTA), wherein the command and Mr. Barber agreed to certain conditions. Among these was an agreement that the NJP and the underlying misconduct (him marrying his wife), could not be used against Mr. Barber as a basis for administrative discharge.

14.     Mr. Barber's then-current period of enlistment was coming to an end in December 2019, and Mr. Barber executed the pre-trial agreement in August 2019. Typically, when an enlistment contract ends, the Marine in question is administratively discharged from the service. The alternative, reenlistment, entails submission of a package requesting favorable endorsement from the Marine's chain of command. In ordinary cases, unless they are preempted in some fashion, an NJP and misconduct can be used as a basis for denying a request for reenlistment, thereby causing the Marine to be administratively discharged at the end of his contracted enlistment date.

15.     To ensure the NJP or alleged fraternization underlying the NJP would not be used as a basis to deny him reenlistment, Mr. Baber included in his PTA the following: "[F]or the sole charge and specification to which I will plead guilty at NON-JUDICIAL PUNISHMENT, the Convening Authority agrees to not use such misconduct, or any other misconduct known or suspected at the time of the agreement, as a basis for administrative separation proceedings or additional criminal action." (emphasis in original). This understanding was subsequently confirmed by Mr. Barber's civilian defense counsel in communication with the CG's Staff Judge Advocate.

16.     On or about August 14, 2019, Mr. Barber and his counsel attended the NJP proceedings with the CG, at which time the CG indicated his intention behind the PTA was to allow Mr. Barber to finish 20 years of service. Given Mr. Barber's impending conclusion to his then-current enlistment period, this overtly shared goal would inherently touch upon the topic of reenlistment. As previously stated, the decision on Mr. Barber's reenlistment request would culminate in either administrative separation or his continued service in the Marines.[2]

17.     On August 22, 2019, the CG's Staff Judge Advocate emailed Mr. Barber's counsel that the CG would make his recommendation on Mr. Barber's reenlistment package after a review of Mr. Barber's *entire* record, and that this recommendation would be made via endorsement. This correspondence signaled that the Staff Judge Advocate and the CG would consider and abide by the terms of the PTA as it was part of Mr. Barber's record. Accordingly, Mr. Barber's counsel took

---

[2] The administrative separation process is automatically triggered upon expiration of an enlistment term. *See* Marine Corps Order (MCO) 1900.16 ch. 2, ¶1002(8); Dep't of Defense Instruction 1332.14, Encl. 3 (1)(a); *see also infra* ¶ 32. As part of the administrative separation proceedings, a Marine can opt to pursue reenlistment, which if endorsed and approved, functions as an exit valve from the administrative separation process and returns the Marine to service.

this as affirmation of the agreement not to use the NJP and misconduct as a basis for administratively discharging him from the Marine Corps. Exhibit 1.

18. With this reassurance, Mr. Barber submitted his reenlistment package on October 16, 2019. The very next day, he was issued a "counseling" pursuant to the Marine Corps Separation Manual (MCO 1900.16), paragraph 6105 (hereinafter "6105 counseling), documenting that he had been found guilty at NJP of violating Article 92, Uniform Code of Military Justice (Violation of Lawful Order). Per the Marine Separation Manual, the official purpose of 6105 counseling is to inform Marines of deficiencies and to offer them a chance to rehabilitate; yet, unofficially, and as is routinely the case, they are used to build an administrative record for involuntary separation. In Mr. Barber's case, there was no further misconduct beyond his relationship with his wife. Consequently, the 6105 Counseling Form, which was solely derived from the NJP, was used against Mr. Barber as a basis to deny him his requested reenlistment.

19. On November 1, 2019, the CG recommended denial of reenlistment, citing the underlying misconduct of the NJP as the reason for the denial. Accordingly, on January 7, 2020, Mr. Barber was informed that he would not be recommended for reenlistment, and that he would be assigned a reenlistment code of RE-4. The notice failed to state the reason for the RE-4, which precludes Mr. Barber from reenlisting into another branch of the military or in the Marine Corps Reserve.

20. In an attempt to clarify why the PTA was no longer being upheld, Mr. Barber's counsel reached out to the CG on January 10, 2020, for an explanation:

> Sir,
>
> Good evening. During the process leading up to and including your statements during the NJP you indicated that while the Gunny would not be promoted to First Sergeant, the intention behind the PTA was to allow the Gunnery Sergeant to finish his 20 [years]… I

6

> respectfully request that in the spirit of what was intended and the misconduct in this case – marriage – that you consider allowing him to obtain an extension and continue to earn his uniform.

21. In response, the CG acknowledged Mr. Barber's intention in entering the PTA was to finish his service through retirement, but concluded that he "always considered the process for requesting continued service beyond current enlistment as a separate matter."

22. Mr. Barber was subsequently discharged on February 3, 2020, with a RE-4 reenlistment code. He has tried unsuccessfully to reenlist in the Marine Corps Reserve; the RE-4 was the sole barrier.

23. In October 2021, Mr. Barber petitioned the BCNR, arguing in part that he and the CG had executed the PTA agreeing that he would not be administratively separated from the Marine Corps, with the intent that he be able to reach retirement. The petition argued that the denial of reenlistment and issuance of a RE-4 violated the material terms of the PTA.

24. In support of his petition, Mr. Barber presented evidence that the PTA was signed with the knowledge and understanding that the NJP and misconduct would not be used as a basis for separation, and that he would be permitted to retire at 20 years. Evidence included his counsel's email communication with MajGen Jurney and the response to the 6105 counseling.

25. In March 2022, the BCNR denied the petition, finding the terms to be unambiguous, and stating:

> Your attorney argues that it was their clear intent that this agreement protect you until you were retirement eligible; however, if that was the case, such terms should have been negotiated into the PTA. Your attorney's well-intended strategy never made it into the PTA, and no exceptions to parol evidence rule concepts exist to permit any purported intentions or misunderstandings outside of the PTA to modify the agreement after the fact.

This lawsuit follows.[3]

## FIRST CAUSE OF ACTION

**The BCNR's Findings Regarding the Plain Language of the PTA were Arbitrary, Capricious, and Contrary to Law.**

26. Plaintiff incorporates by reference paragraphs 5-26 of this Complaint.

27. The BCNR's finding that the recommendation against Mr. Barber's reenlistment and the RE-4 reentry code did not violate the terms of the PTA was arbitrary, capricious, and contrary to law.

28. PTAs are contracts between the Convening Authority and the Accused.

29. The PTA stated that "the Convening Authority agrees to not use such misconduct, or any other misconduct known or suspected at the time of the agreement, as a basis for administrative separation proceedings."

30. Accordingly, based on the plain language of the PTA, the NJP and its underlying conduct were not permitted to be used or relied upon in any determination resulting in any administrative separation.

31. MCO 1900.16 ch. 2, ¶1002(8) defines administrative separation as "[d]ischarge or release from Regular or Reserve status upon […] expiration of enlistment, period of induction, or other required period of service, in the manner prescribed by this manual, by law, by the Secretary of Defense or the Secretary of the Navy[.]"[4] Accordingly, reenlistment evaluations are part of the administrative separation process.

---

[3] Mr. Barber initially filed a lawsuit before the Court of Federal Claims; however, he voluntarily dismissed the matter upon realization that the issues underlying this matter were more appropriate before this Court.

[4] Indeed, reenlistment evaluations are uniformly treated as a part of the administrative separation process across the services. *See* Dep't of Defense Instruction 1332.14 ("Enlisted Administrative

32. Mr. Barber's reenlistment proceedings evaluated whether to "[d]ischarge or release" Mr. Barber "from Regular […] status upon […] expiration of enlistment." Accordingly, his reenlistment evaluation was a form of administrative separation proceeding.

33. MajGen Jurney's recommendation against Mr. Barber's reenlistment and the assignment of the RE-4 reentry code took into account Mr. Barber's NJP and its underlying conduct. MajGen Jurney's recommendation against reenlistment was based solely on the NJP and its underlying conduct.

34. The recommendation directly resulted in the discharge of Mr. Barber upon the expiration of his enlistment; in other words, MajGen Jurney's negative endorsement of the reenlistment request directly induced Mr. Barber's administrative separation from the Marine Corps.

35. Accordingly, the actions of MajGen Jurney during Mr. Barber's reenlistment proceedings violated the terms of Mr. Barber's PTA with the Marine Corps by relying on improper bases (e.g., the excluded NJP and conduct). The recommendation against his reenlistment and the assignment of a RE-4 reentry code was based solely on the misconduct underlying the NJP, meaning that but-for the improper inclusion of the NJP and its underlying misconduct in his administrative separation proceeding, Mr. Barber would have been granted reenlistment.

36. The BCNR's finding that the terms of the PTA did not encompass such recommendation against reenlistment or assignment of the RE-4 code on the basis of the underlying misconduct is arbitrary, capricious, and contrary to law. Moreover, the BCNR's

---

Separations") (updated June 23, 2022), Encl. 3 (1)(a) ("An enlisted Service member may be separated upon expiration of enlistment or fulfillment of service obligation."); *see also* Army Regulation 635-200 ("Active Duty Enlisted Administrative Separations") (updated June 28, 2021) (detailing the process of reenlistment consideration as an aspect of administrative separation proceedings, including the relevance of any "local bar[s] to continued service.")

decision denying relief to Mr. Barber was in error: the PTA plainly pertains to reenlistment proceedings and the Marine Corps plainly violated it.

## SECOND CAUSE OF ACTION

**Alternatively, the BCNR's Failure to Construe Ambiguous Language Within the PTA in Mr. Barber's Favor was Arbitrary, Capricious, and Contrary to Law.**

37. Plaintiff incorporates by reference paragraphs 5-26 of this Complaint.

38. A contract is deemed ambiguous when it can be reasonably construed as possessing two or more different meanings. *United States v. Bank of America*, 78 F.Supp.3d 520, 526 (D.D.C. 2015).

39. If deemed ambiguous, extrinsic evidence may be looked toward to determine what a reasonable person in the position of the parties would have thought the disputed language meant. *Id.* at 527.

40. Mr. Barber's interpretation of the PTA as precluding the Marine Corps from using the underlying misconduct as a basis to recommend against his reenlistment (and to consequently assign him a RE-4 reentry code) was reasonable.

41. With Mr. Barber and the BCNR taking two separate reasonable positions, these terms could be considered ambiguous.

42. Mr. Barber submitted evidence to the BCNR (including email correspondence and his response to the 6105 counseling) supporting not just his interpretation of the PTA, but more importantly its reasonableness.

43. The BCNR unreasonably fond the terms unambiguous, disregarded the extrinsic evidence, and denied Mr. Barber's petition.

44. This finding that the terms were unambiguous, and the subsequent disregard of the extrinsic evidence was arbitrary, capricious, and contrary to law.

## THIRD CAUSE OF ACTION

### The BCNR's Decision that no Material Terms in the PTA had been Violated was Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law.

45.     Plaintiff incorporates by reference paragraphs 5-26 of this Complaint.

46.     The BCNR's determination that the material terms of the PTA had not been breached was arbitrary, capricious, an abuse of discretion, and contrary to law.

47.     The PTA explicitly stated that the command "agrees to not use such misconduct, or any other misconduct known or suspected at the time of the agreement, as a basis for administrative separation proceedings or additional criminal action." This was a material term of the agreement. Indeed, Mr. Barber and his counsel ensured that this language be included in the PTA to allow Mr. Barber to preserve his retirement.

48.     Yet, the CG refused to endorse him for reenlistment on the sole basis of the NJP. This refusal, based solely on the NJP and its underlying misconduct, directly contravenes the agreed-upon language, and therefore is in direct violation of this material term. Mr. Barber was also issued the RE-4 reenlistment code without being provided a reason for the code assignment and without having committed any further misconduct.

49.     MCO 1900.16 ch. 2, ¶1002(8) defines administrative separation as "[d]ischarge or release from Regular or Reserve status upon or before expiration of enlistment, period of induction, or other required period of service, in the manner prescribed by this manual, by law, by the Secretary of Defense or the Secretary of the Navy[.]"

50.     By using the misconduct underlying Mr. Barber's NJP as a factor in its reenlistment evaluation, MajGen Jurney and the Marine Corps violated a material term of the PTA. The underlying misconduct was the sole basis negatively endorse Mr. Barber for reenlistment. The underlying misconduct was also the basis for assignment of the RE-4 code. Thus, these actions

constituted an administrative separation from the Marine Corps upon the expiration of Mr. Barber's enlistment period, in direct contravention of the agreement entered between the Marine Corps and Mr. Barber.

51.    As a direct consequence, Mr. Barber has been unable to reenlist in the military or the Marine Corps Reserve.

52.    The BCNR's finding that MajGen Jurney's negative endorsement of Mr. Barber's reenlistment package on the basis of the NJP misconduct was not a violation of a material term of the PTA is therefore arbitrary, capricious, an abuse of discretion, and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court make the following findings and provide the following relief:

(1) Find that the terms were not ambiguous, that the terms clearly constituted a mutual understanding and agreement with respect to not using the NJP misconduct for the purposes of administratively separating Mr. Barber by refusing to positively endorse his reelinstment request, and the negative endorsement and subsequent separation with a RE-4 breached the material terms of the PTA;

(2) Alternatively, find that the terms of the PTA were ambiguous, and that they should have been resolved in Mr. Barber's favor and that he should have been permitted to reenlist;

(3) Remand back to the BCNR to correct Mr. Barber's record in accordance with these findings;

(4) Grant Mr. Barber an award of reasonable costs and attorney fees incurred in bringing this action; and

(5) Grant such other and further relief as this honorable Court deems necessary or appropriate to afford full and complete relief, to include remand to the BCNR for appropriate determination and relief.

Dated: August 24, 2023                              Respectfully submitted,

/s/ *Carol A. Thompson*
Carol A. Thompson
*D.C. Bar No.* 1658143
FEDERAL PRACTICE GROUP
1750 K Street Northwest, Suite 900
Washington, DC 20006-2317
Telephone: (202) 862-4360
Facsimile: (888) 899-6053
cthompson@fedpractice.com

*Counsel for Plaintiff*
