UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSHUA BARBER,

    *Plaintiff*,

v.

TERENCE G. EMMERT,

    *Defendant*.

Civil Action No. 23-2465 (LLA)

**MEMORANDUM OPINION**

Joshua Barber brings this action against Acting Secretary of the U.S. Navy Terence G. Emmert. ECF No. 1.[1] He alleges that the U.S. Navy's Board for Correction of Naval Records ("Board") acted arbitrarily and capriciously when it denied his petition to alter his military record. *See generally id.* Mr. Barber and Secretary Emmert have filed cross-motions for summary judgment. ECF Nos. 12, 14. For the reasons explained below, the court will deny Mr. Barber's motion for summary judgment and grant Secretary Emmert's motion for summary judgment.

    **I.**    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    **A.**    **Mr. Barber's Enlistment**

An enlisted service member serves for a defined period of time known as an "enlistment." 10 U.S.C. § 505. When that term expires, a commander may discharge the service member unless he or she reenlists or some other exception applies. Marine Corps Order ("MCO") 1900.16 ¶ 1005;

---

[1] Although Mr. Barber named former Secretary of the Navy Carlos Del Toro as the defendant in his complaint, Acting Secretary Terence G. Emmert "is automatically substituted as a party" in his place pursuant to Federal Rule of Civil Procedure 25(d).

ECF No. 21-2.  Reenlistment "involves the execution of a new contract by an enlisted Marine" and "replaces either a current enlistment/reenlistment contract or one which has been terminated by separation."  MCO 1040.31 ¶ 4-1; ECF No. 21-1, at 1.  No service member "has a right to enlist or reenlist in the armed forces, unless specially given one by statute or regulation."  *Dodson v. U.S. Dep't of the Army*, 988 F.2d 1199, 1203-04 (Fed. Cir. 1993).

Mr. Barber enlisted in the U.S. Marine Corps in August 2002 and was promoted to the rank of Gunnery Sergeant in 2016.  Administrative Record ("AR") 1, 9.  Mr. Barber reenlisted multiple times, with his final reenlistment occurring in April 2014 for a period of four years.  AR 1.  In October 2016, he extended his enlistment by twenty-one additional months, from April 2018 to January 2020.  AR 1.

### B.     Fraternization Charges, Non-Judicial Punishment, and Pretrial Agreement

In 2018, while at Marine Corps Base Kaneohe Bay in Hawaii, Mr. Barber began a romantic relationship with Melissa Caldwell, a female junior Marine Corps officer in the same command unit.  AR 2, 22.  Mr. Barber's commanding officers were not aware of the relationship at the time.  AR 22.  The two married in June 2018.  AR 9.  Later that month, Mr. Barber filed a "Dependency Application" naming Ms. Caldwell as his wife.  AR 9, 284.  Ms. Caldwell, who was scheduled to relocate to North Carolina, did not immediately update her personnel file with information about her marriage.  *See* AR 22; ECF No. 1 ¶¶ 8-9.[2]  When the Marine Corps began processing

---

[2] According to Mr. Barber, he and Ms. Caldwell "decided to inform the Marine Corps of their marriage to receive the benefits they were due as a couple when [Ms.] Caldwell changed duty stations."  AR 25.

2

Ms. Caldwell's duty reassignment, this discrepancy prompted an investigation that eventually resulted in fraternization charges against both individuals. AR 1-2, 25.[3]

Mr. Barber initially declined to accept a non-judicial punishment ("NJP") and instead opted to be tried by court-martial. AR 2.[4] Ms. Caldwell, however, accepted an NJP in December 2018 and pleaded guilty to the fraternization charge. AR 2. Pursuant to her NJP, in January 2019, Ms. Caldwell tendered her resignation in lieu of an administrative separation. AR 2.

Mr. Barber subsequently decided to accept an NJP. AR 2. His civilian attorney negotiated a pretrial agreement ("PTA") with the court-martial Convening Authority, Major General William M. Jurney. AR 2.[5] Pursuant to the PTA, the convening authority would dismiss the pending court-martial charge for fraternization. AR 2. The agreement also provided, in relevant part:

> Additionally, for the sole charge and specification to which I will plead guilty at [NJP], the Convening Authority agrees to not use such misconduct, or any other misconduct known or suspected at the time of the agreement, as a basis for administrative separation proceedings or additional criminal action. The parties agree and understand in the event the accused engages in future or further misconduct that the NJP which is the subject of this agreement may be used in support of administrative separation proceedings.

---

[3] The Marine Corps prohibits "fraternization," which is defined as "[p]ersonal relationships between officer and enlisted members," "between officer members," or "between enlisted members" that "are unduly familiar and that do not respect differences in grade or rank." Marine Corps Manual ¶ 1100-4; AR 125. The first category of relationships is per se prohibited, whereas the latter two categories are prohibited "[w]hen prejudicial to good order and discipline or of a nature to bring discredit on the Marine Corps." Marine Corps Manual ¶ 1100-4; AR 125. Fraternization is "neither excused nor mitigated by [a] subsequent marriage between the parties." Marine Corps Manual ¶ 1100-6; AR 127. Because Mr. Barber was enlisted and Ms. Caldwell was an officer, their relationship constituted per se fraternization. ECF No. 12-1, at 1.

[4] A non-judicial punishment may be issued in lieu of formal court-martial proceedings. *See* ECF No. 12, at 2.

[5] At the time, Major General Jurney was a Brigadier General. *See* AR 212. The court will refer to him as "Major General Jurney" for clarity.

3

AR 209. The PTA also provided that "[t]here are no other agreements, oral or written, expressed or implied, between [Mr. Barber] and the Convening Authority, or any other representative of the Government." AR 211. Mr. Barber, his civilian defense attorney, his military defense attorney, and Major General Jurney all signed the PTA. AR 212. Upon conclusion of the NJP proceedings, Mr. Barber also signed an acknowledgment "that acceptance of [the] NJP d[id] not preclude [his] command from taking other adverse administrative action against [him]." AR 463. When signing this portion of the form, he wrote "But see PTA." AR 463. Mr. Barber did not appeal his NJP. AR 2.

Throughout the negotiations concerning his fraternization charges and the NJP process, Mr. Barber was primarily concerned with preserving his retirement eligibility. *See* AR 30, 242-43. Marines become eligible for retirement after twenty years of service, meaning that Mr. Barber would need to serve an additional two years beyond the expiration of his enlistment term in early 2020. *See* ECF No. 12-1, at 11-12; AR 1 (explaining that Mr. Barber enlisted in August 2002). Mr. Barber was under the impression that, upon acceptance of the NJP, he would be "allow[ed] . . . to finish his 20 [years of service]" and receive retirement benefits. AR 30, 243.

### C.   Reenlistment Request

As noted, Mr. Barber's enlistment was set to expire in January 2020. AR 1. In September 2019, he submitted a request for reenlistment. *See* AR 226-28. Three of his unit commanders recommended approval, but two disapproved. AR 226-27. Major General Jurney reviewed the materials, recommended that his request be denied, and forwarded the packet to the Office of the Commandant of the Marine Corps ("Commandant") for a final decision. AR 228. Specifically, he wrote:

> Although Gunnery Sergeant Barber states that he is a Marine with "17 years of noteworthy accomplishments," he had 15 years and 8

4

>months of service at the time that he married a Marine Officer assigned to the same artillery battalion.
>
>After careful and full consideration of Gunnery Sergeant Barber's demonstrated performance and conduct throughout his entire career, I do not believe that he possesses the judgment and maturity required for continued service as a Staff Noncommissioned Officer.

AR 228. In December 2019, Mr. Barber extended his enlistment one final time until February 2020 while he awaited the Commandant's reenlistment decision. AR 338.

In January 2020, Mr. Barber's reenlistment request was denied and he was given a reentry code of RE-4. AR 340.[6] His civilian attorney contacted Major General Jurney shortly thereafter seeking an explanation for the denial. AR 242-43. The attorney expressed his and Mr. Barber's understanding that "the PTA w[ould] . . . allow [Mr. Barber] to finish his 20." AR 243. In response, Major General Jurney acknowledged Mr. Barber's understanding and intention behind the PTA but explained that it was "limited to fairly adjudicating [Mr. Barber's] misconduct at the appropriate level." AR 241. Major General Jurney continued:

>I have always considered the process for requesting continued active service beyond current enlistment as a separate matter since I'm not the decision authority . . . .
>
>Each case is distinct and deserves that I consider it on its own merit and circumstances. In this case, I ultimately determined that I would not support [Gunnery Sergeant] Barber's request for an additional tour of active duty and prepared my endorsement accordingly. . . .
>
>As you know, my endorsement merely provided a recommendation to [the Commandant,] who made the ultimate decision . . . to not accept [Mr. Barber's] request for an additional tour of active duty.

---

[6] A reentry code of RE-4 effectively prohibits a service member from reenlisting in any branch of the armed forces. *See* AR 23.

AR 241-42.  Mr. Barber was discharged from the Marine Corps in February 2020.  AR 239-40.  While he attempted to reenlist in the U.S. Army Reserves and National Guard, his RE-4 reentry code prevented him from doing so.  ECF No. 12, at 5; *see* AR 29.

### D.     Board Review and Civil Complaint

In October 2021, Mr. Barber petitioned the Board to (1) upgrade his reentry code or otherwise permit him to reenlist and secure full retirement benefits and (2) modify the narrative reason for his separation.  AR 17, 39.  In support of his request, Mr. Barber argued that the PTA had been signed with the understanding that he would "be allowed to retire . . . by extending his enlistment out to reach the 20 years required for full retirement."  AR 22.  In March 2022, the Board denied Mr. Barber's petition, explaining that it

> unequivocally disagreed with any argument or suggestion that: (a) the terms of the PTA precluded the Marine Corps from preventing [his] reenlistment, (b) that [his] RE-04 reentry code was a de facto administrative separation prohibited by the PTA, and/or (c) that there was any breach of duty of good faith and fair dealing in the PTA negotiation.

AR 3.  The Board acknowledged that Mr. Barber's attorney had *intended* for the PTA to protect Mr. Barber until he was eligible for retirement but concluded that "such terms should have been negotiated into the PTA" and that "purported intentions or understandings outside of the PTA [could not] modify the agreement after the fact."  AR 4.  The Board further explained that while "[t]he PTA indeed protected [Mr. Barber] from an administrative separation for the misconduct adjudicated at NJP," he "w[as] never subject to an administrative separation prior to [his end of

6

active service]." AR 4.[7] Instead, "the NJP/PTA process and [Mr. Barber's] reenlistment request were always two mutually exclusive undertakings." AR 5. Accordingly, the Board concluded that Mr. Barber's discharge and denial of reenlistment did not materially violate the terms of the PTA or any implied covenant of good faith and fair dealing. AR 5.

In August 2023, Mr. Barber filed suit in this court and argued that the Board's conclusions were arbitrary and capricious. ECF No. 1. In April 2024, Mr. Barber moved for summary judgment. ECF No. 12. Secretary Emmert filed an opposition and a cross-motion for summary judgment. ECF Nos. 14, 15. Both motions are now fully briefed. ECF Nos. 16, 17, 21.

## II.   LEGAL STANDARDS

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, a court shall "set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2). Pursuant to this standard, the court must ensure that the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 8 (D.C. Cir. 2013) (quoting *Keating v. Fed. Energy Regul. Comm'n*, 569 F.3d 427, 433 (D.C. Cir. 2009)). An agency acts arbitrarily and capriciously if it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

---

[7] The Board further elaborated that an administrative separation, as opposed to the mere end of active service, would have been "a separate and distinct process" that "require[d] notice[] and an election of certain rights." AR 5. The Board determined that Mr. Barber's "command never contemplated or initiated an administrative separation post-NJP[,] in accordance with the terms of the PTA." AR 5.

7

difference in view or the product of agency expertise." *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997-98 (D.C. Cir. 2008)).

In cases proceeding under the APA, the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply "because of the court's limited role in reviewing the administrative record." *Albino v. United States*, 78 F. Supp. 3d 148, 163 (D.D.C. 2015). The court may only review the record "that was before the [agency] at the time [it] made [its] decision." *Am. Wildlands*, 530 F.3d at 1002 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Albino*, 78 F. Supp. 3d at 163 (quoting *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding . . . whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

When reviewing determinations by a military corrections board, the agency "is entitled to even greater deference." *Powers v. Donley*, 844 F. Supp. 2d 65, 70 (D.D.C. 2012); *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989) (explaining that military record corrections decisions are subject to "an unusually deferential application of the 'arbitrary or capricious' standard"). The court will only step in to correct "the most egregious decisions," *Kreis*, 866 F.2d at 1515, so that it does not become "a forum for appeals by every soldier dissatisfied with [a military corrections board's conclusion]," *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000). The key inquiry is whether "the decision making process was deficient, not whether [the] decision was correct." *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (alteration in original) (quoting *Kreis*, 866 F.2d at 1511). Accordingly, the military board's determination "need

not be a model of analytic precision," but it "must minimally contain a rational connection between the facts found and the choice made." *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 163 (D.D.C. 2011) (internal quotation marks omitted) (quoting *Dickson*, 68 F.3d at 1404).[8]

### III. DISCUSSION

Mr. Barber argues that the Board committed three sequential errors by deciding that: (1) the PTA's terms were unambiguous; (2) there was no material violation of the PTA's terms; and (3) there was no breach of the duty of good faith and fair dealing. ECF No. 12-1, at 10-17. Because the court agrees with the Secretary that the PTA's terms were unambiguous, it need not consider Mr. Barber's latter two arguments.

A PTA between a service member and a military branch functions as a contract, meaning that ordinary rules of contract interpretation apply. *United States v. Acevedo*, 50 M.J. 169, 172 (C.A.A.F. 1999). A contract's language "is ambiguous if it is reasonably susceptible of different constructions, but it is not ambiguous merely because the parties later disagree on its meaning." *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (citation omitted). The contested portion of the PTA reads as follows:

> Additionally, for the sole charge and specification to which I will plead guilty at [NJP], the Convening Authority agrees to not use such misconduct, or any other misconduct known or suspected at the time of the agreement, as a basis for administrative separation proceedings or additional criminal action. The parties agree and understand in the event the accused engages in future or further misconduct that the

---

[8] Decisions by military record review boards are informal adjudications, meaning that they are not subject to the higher substantial-evidence review standard. *See McKinney v. Wormuth*, 5 F.4th 42, 46 (D.C. Cir. 2021). Occasionally, however, an informal adjudication can trigger substantial-evidence review if done by a "special board" as defined by 10 U.S.C. § 1558(b)(1). *See* 10 U.S.C. § 1558(f)(3). But because "[t]he record contains no evidence that the Secretary designated the Board reviewing [Mr. Barber]'s application as a special board," the court will not assume that it was. *McKinney*, 5 F.4th at 46 n.1; *see Sakievich v. United States*, 160 F. Supp. 3d 215, 224 (D.D.C. 2016) (similar).

9

> NJP which is the subject of this agreement may be used in support of administrative separation proceedings.

AR 209.  Mr. Barber argues that the PTA's language was ambiguous because "administrative separation" could have multiple meanings.  ECF No. 12-1, at 10.  In his view, denying his reenlistment was "a form of administrative separation" because it prevented him from continuing in active service.  *Id.* at 11.  Under that interpretation, the PTA's prohibition against using Mr. Barber's misconduct "as a basis for administrative separation proceedings" should have prevented the denial of his reenlistment.  The court is not convinced.

As an initial matter, the PTA says nothing about reenlistment.  *See* AR 209-12.  No part of the agreement guaranteed that Mr. Barber would be allowed to reenlist after the end of his final service contract.  It also did not prevent the Marine Corps or any other authority from using his misconduct to deny reenlistment.  Indeed, Mr. Barber later acknowledged that the NJP "d[id] not preclude [his] command from taking other adverse administrative action against [him]."  AR 463.  While Mr. Barber wrote "But see PTA" directly below this acknowledgment, AR 463, this reference does not help because, again, the PTA did not once mention reenlistment, *see* AR 209-12.

Therefore, Mr. Barber can only inject ambiguity into the PTA if the denial of reenlistment *is* a form of administrative separation.  But, as the Board explained, "the NJP/PTA process and [Mr. Barber's] reenlistment request were always two mutually exclusive undertakings."  AR 5.  The Marine Corps' regulations governing reenlistment confirm this.  They explain that reenlistment "involves the execution of a new contract by an enlisted Marine."  MCO 1040.31 ¶ 4-1; ECF No. 21-1, at 1.  Such a contract "replaces either a current enlistment/reenlistment contract or *one which has been terminated by separation*."  MCO 1040.31 ¶ 4-1 (emphasis added); ECF No. 21-1, at 1 (emphasis added).  Marines who wish to reenlist must request to do so "prior to midnight of the last day of [their] current enlistment/extension," and such reenlistment (if

10

granted) "will be effective on the day following the date of separation." MCO 1040.31 ¶ 4-1; ECF No. 21-1, at 1. Taken together, these regulations demonstrate that separation and reenlistment are treated as separate procedures.[9] The Board's reading of the Marine Corps' own regulations, to which this court owes significant deference, was therefore reasonable. *See Coburn v. McHugh*, 77 F. Supp. 3d 24, 30 (D.D.C. 2014) (explaining that a court defers to a military board's "interpretation of its regulations 'unless it is plainly wrong'" (quoting *Fontana v. Caldera*, 160 F. Supp. 2d 122, 129 (D.D.C. 2001))); *id.* ("[T]he [Board]'s interpretation of its regulations 'need not be the only possible reading' as long as it does not directly contradict the regulations." (quoting *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 613 (2013))).[10]

By its plain terms, the PTA therefore only prohibited the Marine Corps from administratively separating Mr. Barber *because of* his misconduct. *See* AR 209 ("[T]he Convening Authority agrees to not *use* such misconduct . . . *as a basis* for administrative separation proceedings[.]" (emphases added)). It did not immunize him from *all* forms of "administrative separation." Thus,

---

[9] Assuming for the sake of argument that separation and reenlistment are intertwined parts of the same process, Mr. Barber still would not be able to demonstrate a violation of the PTA. The PTA states that "the *Convening Authority*"—i.e., Major General Jurney—"agrees to not use such misconduct . . . as a basis for administrative separation proceedings." AR 209 (emphasis added). Reenlistment decisions, however, are made by the Commandant, not the convening authority. MCO 1040.31 ¶¶ 4-3, 4-14. While Major General Jurney made a negative recommendation on Mr. Barber's reenlistment application, he did not have final decisional authority. Mr. Barber thus cannot fault Major General Jurney for a determination that he did not and could not make. *See* AR 5 ("The [Convening Authority] made it clear to your counsel that he considered reenlistment a separate matter given [that] he was not the decision authority for reenlistments.").

[10] Deference to an agency's interpretation of its own regulations originates from *Auer v. Robbins*, 519 U.S. 452 (1997). *See Decker*, 568 U.S. at 613 (citing *Auer*, 519 U.S. at 461). While the Supreme Court has overruled *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)—which afforded deference to an agency's interpretation of ambiguous *statutory language*, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024)—*Auer* deference is separate and survived *Chevron*'s overruling, *see Kisor v. Wilkie*, 588 U.S. 558, 589 (2019) (rejecting a direct request to overrule *Auer*); *see generally Loper Bright Enters.*, 603 U.S. 369 (2024) (making no mention of *Auer*).

even assuming that his end-of-service discharge following the denial of reenlistment was an "administrative separation proceeding[]"—which the parties dispute—Mr. Barber still cannot prevail.[11] The administrative record demonstrates that the fraternization charges and underlying misconduct were not used "as a basis" for Mr. Barber's separation.  Instead, he was discharged in the ordinary course because of the expiration of his enlistment period—something that would have occurred regardless of his misconduct.  *See* AR 3 ("Ultimately, on 3 February 2020 at the expiration of your enlistment (as previously extended), you were discharged from the Marine Corps[.]"); *id.* at 239 (stating "non-retention on active duty" as the "narrative reason for separation").

      The Board concluded the same.  In denying Mr. Barber's petition for correction, it acknowledged that "[t]he PTA indeed protected you from an administrative separation for the misconduct adjudicated at NJP" but explained that Mr. Barber "w[as] never subject[ed] to an administrative separation prior to [his end of active service]." AR 4.  Based on the language of the PTA, the Board's conclusion that Mr. Barber was not separated on the basis of his misconduct was reasonable.  While his misconduct may have been used to deny *reenlistment*, that was a separate process.  *See supra* pp. 9-11.

---

[11] Both parties contest whether "administrative separation proceedings" in the context of misconduct include routine discharges at the end of a Marine's enlistment term.  *See* ECF No. 14, at 14-18; ECF No. 16, at 2-3.  Secretary Emmert argues that the term must be construed to reference "administrative separations involving formal proceedings . . . [under] the procedural requirements at chapter 6, section 3 of the [Marine Corps'] separation manual." ECF No. 14, at 16.  That chapter requires the Navy to provide the Marine with notice before initiating administrative separation proceedings—something the Navy did not do in Mr. Barber's case.  Marine Corps Separation & Retirement Manual ¶ 6303; ECF No. 21-3, at 13; *see* AR 4-5 (explaining that "administrative separation for . . . misconduct . . . is a separate and distinct process . . . [that] requires notice[] and an election of certain rights").  The court does not address this argument because, even assuming that an end-of-service discharge is an "administrative separation proceeding[]" within the meaning of the PTA, Mr. Barber still cannot demonstrate that he was discharged on the "basis" of his misconduct.

Because the terms of the PTA were unambiguous, the contract's language is controlling and the court "need not address the parties' negotiation history or any other extrinsic evidence." *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024). Whatever Mr. Barber's or his counsel's intentions may have been with respect to the agreement, those intentions "never made it into the PTA." AR 4.[12] If Mr. Barber wanted to guarantee his reenlistment, he should have negotiated it into the plain terms of the contract. Instead, he only secured protection from an administrative separation based on his misconduct. Because that never occurred, there was no violation of the PTA's terms. The Board's ultimate decision on Mr. Barber's petition was therefore neither arbitrary nor capricious.[13]

---

[12] Mr. Barber repeatedly asserts that he agreed to the NJP and PTA "with the understanding" that he would be permitted to serve a total of twenty years and earn retirement benefits. ECF No. 12-1, at 12. While his counsel communicated this understanding to Major General Jurney, the Major General expressly disavowed it. *See* AR 241-42 ("I understand from your correspondence that your intention behind the PTA was to 'allow the Gunnery Sergeant to finish his 20,' however; my intentions for that same PTA were limited to fairly adjudicating his misconduct at the appropriate level."). In any event, simply claiming that the parties intended one outcome means nothing when the plain text leads to an entirely different result. *See Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (D.C. 2013) ("[T]he written language embodying the terms of an [unambiguous] agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract[.]" (second alteration in original) (quoting *Dyer v. Bilaal*, 983 A.2d 349, 354-55 (D.C. 2009))).

[13] Because the terms of the PTA were unambiguous, Mr. Barber's claim that Major General Jurney breached the covenant of good faith and fair dealing necessarily fails. *See Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 173 (D.D.C. 2011) (dismissing a breach-of-good-faith claim where the plaintiff was "bound by [a contract's] unambiguous terms").

## IV.  CONCLUSION

For the foregoing reasons, the court will deny Mr. Barber's Motion for Summary Judgment, ECF No. 12, and grant the Secretary's Cross-Motion for Summary Judgment, ECF No. 14.  A contemporaneous order will issue.

*[signature]*

————————————————
LOREN L. ALIKHAN
United States District Judge

Date:   March 20, 2025